The **INTERNATIONAL MILLING COMPANY**, Appellee,

v.

**BROWN STEAMSHIP COMPANY**, Appellee,
**The Great Lakes Towing Company**, Appellant,
**The Wayne Steamship Co., Inc.**, Appellant.

No. 34, Docket 25131.

United States Court of Appeals Second Circuit.

Argued Oct. 15, 1958.

Decided Nov. 18, 1958.

Arthur E. Otten, Buffalo, N. Y., for Great Lakes Towing Co.

James P. Heffernan, Coffey, Heffernan & Harrison, Buffalo, N. Y., for appellee Brown S. S. Co.

William M. Connelly, Buffalo, N. Y., for International Milling Co.

Russell V. Bleecker, Cleveland, Ohio, for Wayne S. S. Co.

Before HAND, HINCKS and WATERMAN, Circuit Judges.

HAND, Circuit Judge.

This appeal is from a decree in the admiralty holding liable the ship, "Gallagher" (of The Wayne Steamship Company Inc.) and the tug, "Oklahoma" (of The Great Lakes Towing Company) for injury to the "legs" of libellant's elevator which were projected into the hold of the "McAlpine" (of the Brown Steamship Company). (We shall refer to the ships throughout and not to the owners.) Judge Burke found the "Gallagher" and the "Oklahoma" at fault and therefore liable to the libellant and exonerated the "McAlpine." On the afternoon of October 25th the "McAlpine," loaded with a cargo of grain, was made fast in

the Buffalo River alongside a grain "elevator" of the libellant. She lay with her starboard side touching the wharf, made fast by six mooring lines, five of which were seven-eighths of an inch steel cables and the sixth an eight inch manila rope. These were rigged as follows: she had forward two "mooring machines" from one of which one steel cable led forward about 48 feet to some fastening on the dock and the other led aft about 48 feet to another similar fastening. She also had two mooring machines aft, the cable from one leading forward 48 feet to the dock and the cable from the other leading aft the same distance. In addition, she had a fifth cable leading from a mooring machine on her fantail thirty feet to the dock. The manila rope led forward from a windlass on her bow forty feet to the dock.

All the steel cables were "on steam," as the phrase is; the manila cable was made fast. "On steam" means that the winch to which the cable is attached is under steam pressure such that when the pull upon the cable increases it will pay out, and when the pull decreases the cable will take up. In the case of a vessel that is discharging cargo this arrangement enables her to rise as she is discharged without any change in her fasts. By the afternoon of the 26th, the "McAlpine" had discharged about four-fifths of her cargo, which was done by letting into her holds what are known as "legs." These are of steel about four feet square, 100 feet long; they operate by means of endless belts, equipped with buckets, and as the belts revolve the buckets fill with grain, carry it up and empty it into a warehouse upon the dock. The "McAlpine's" hatches were nine feet fore and aft, so that there was only two and one-half feet clearance between each side of a "leg" and the coamings of the hatch; and it is easy to raise or lower a "leg" out of a hatch. At the time of the accident the two "legs" were inserted in her hatches, and went deep into the hold.

While the "McAlpine" was so moored the "Gallagher" wished to pass her, moving upstream, so as to turn around above in a widening of the river and pass back in the other direction. She could have been pulled out astern into the main stream, but that would have taken two tugs. She engaged the "Oklahoma," passing a line from her bow to the tug's stern, cast off her lines, got under way, and the tug gave the "bend signal" required by Coast Guard Regulation 90.6. About 700 feet above her berth the river bends to the right about ninety degrees and the "McAlpine" lay above this bend on the right side of the channel as the "Gallagher" was to pass her. Moreover, the "McAlpine" was concealed from a vessel moving upstream until after her nose had passed the angle of the bend. As the "Gallagher" and the tug did pass this angle they saw the "McAlpine" with her stern about seventy-five feet beyond the corner of the bend. The "Gallagher" with the help of the tug had made a turn of about fifty degrees when the tug gave her a signal of two blasts to back, the purpose being to throw the "Gallagher's" stern still further to the left and complete the turn. At the same time, the tug went full speed ahead, pulling the "Gallagher's" bow to the right. After the "Gallagher" had lapped the "McAlpine" so that her bridge was about opposite "McAlpine's" stern, the action of the water that the tug and tow displaced was enough to pull the "McAlpine" a few feet astern and her stern somewhat away from the dock. The "legs" of the elevator, not having been withdrawn from the hatches, came in contact with the coamings and one of them was broken. This is the damage complained of.

Judge Burke held that the "McAlpine" was properly moored so that no fault attached to her. He also held that the tug and the "Gallagher" should have known that the "legs" were in the holds of the "McAlpine," and that "it amounted to lack of reasonable care to make the turn by working the propellers at full speed without notifying the Steamer McAlpine by proper warning signal, so that those in charge of her could cause the elevator

legs to be removed from the McAlpine before the propellers were worked at full speed. In the exercise of due care and caution, the Masters of the Steamer Gallagher and the Tug Oklahoma should have known that the working of the propellers at full speed in such close proximity to the moored McAlpine would cause her to surge at the dock, and should have known that such surging would be likely to cause damage to the elevator legs if they remained in the holds." There was a conflict of evidence as to whether it was customary to raise the "legs" of an elevator when a moving vessel passes a moored vessel. There was also conflict of testimony as to the speed at which the "Gallagher" was moving upstream and around the bend before she began to back upon the signal of the tug. The surging of the "McAlpine" broke her two steel cables which led forward, and the manila rope slipped on the windlass.

We cannot accept the finding that the "McAlpine" was "properly moored." We do not mean that, if the manila eight inch line had been properly made fast around the windlass, the mooring might not have been held adequate; but when the ship "surged" five feet astern and to some distance away from the dock, and the line did not part, it followed inevitably that the line slipped or rendered on the windlass. It must be remembered that the resultant of the pull of four of the steel cables must have been substantially neutral, unless the winchmen adjusted the steam pressures on the winches which they did not do. Before that the ship was held from movement astern only by the manila rope and the pull of that was in part neutralized by the steel cable leading from the fantail. When a ship passed some adjustment of the steam was necessary, and perhaps of the manila line also. The failure to take these measures was clearly a fault.

There was no finding that the disturbance was unusual. The judge based the flotilla's liability solely upon the fact that it did not alert the "McAlpine" as to its presence and its proposed movement. There was indeed testimony that the flotilla had been coming upstream and around the bend at a speed of four or five miles; but, aside from the inherent improbability of this, the judge made no such finding. There was also testimony that, when the tug gave the "Gallagher" the signal to back, she backed too strongly, but on that issue too there is no finding, and indeed the testimony of the flotilla is that the backing was no more than usual. Therefore we should find it difficult to support the decree on this record even though we disregarded the evidence that those on board the "McAlpine" were aware of the presence and expected navigation of the flotilla in season to change the collective resultant pull of the steel cables.

Moreover, we cannot agree that the record supports a finding, which we assume is to be implied though it was not expressly made, that those on the "McAlpine" did not have time to raise the "legs" or adjust the mooring, after they became aware of the presence of the flotilla. Sheridan, the mate, said that he knew the flotilla was there and told one watchman to watch his machines. If that was true and he did not adjust the steam, any fault of the flotilla in failing to give warning was irrelevant. One of the "leg" operators, an employee of the libellant, estimated that it was ten minutes between the appearance of the "Gallagher" and the "McAlpine's" surge. The other saw the tug with a line as it emerged from around the bend of the river. Neither made any effort to lift his "leg" until the "surge," nor did those in charge of the "McAlpine" tell them to do so or take any action toward securing the ship. If it had been found that the flotilla backed with unusual violence there might still be room for a conclusion of joint liability, but, as we have said, its liability was in fact based only upon its failure to give seasonable notice of its presence. Therefore, even though we were to assume that the flotilla owed a duty to alert the "McAlpine," we could not accept a finding that the ship did not have adequate notice.

We do not rely upon the "bend signal," for we agree that the "McAlpine," not being a descending vessel, was not charged with shaping her conduct upon it.

The decree against the "Gallagher" and the tug will be reversed, and the libel dismissed as to their owners. The libellant did not appeal from that part of the decree that dismissed the libel as against the "McAlpine," nor has it on this appeal suggested that the dismissal should be reversed. We have therefore not considered our jurisdiction, if any, to consider this question under the old doctrine that an appeal in the admiralty is a new trial.

Decree reversed and libel dismissed as against The Great Lakes Towing Company and The Wayne Steamship Co. Inc.

HINCKS, Circuit Judge, concurs in the result.